Sherilyn A. Olsen, #9418
Burke R. Gappmayer #11088
Holland & Hart LLP
222 S. Main Street, Suite 2200
Salt Lake City, UT 84101
Telephone: (801) 799-5800
Fax: (801) 799-5700
solsen@hollandhart.com
brgappmayer@hollandhart.com
*Proposed Attorneys for Debtors-In-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| In re: | Bankruptcy No. 20-22804 |
|---|---|
| PENUMBRA BRANDS, LLC | Chapter 11 |
| Debtor-In-Possession, | Honorable Joel T. Marker |
| In re: | Bankruptcy No. 20-22806 |
| PENUMBRA BRANDS HOLDINGS, INC. | Chapter 11 |
| Debtor-In-Possession, | Honorable William T. Thurman |

## DECLARATION OF GENTRY W. JENSEN
## IN SUPPORT OF CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Gentry W. Jensen, declare the following:

1.      I am the Chief Executive Officer and President of Penumbra Brands, LLC

("**Penumbra LLC**"). I am the Chief Executive Officer for Penumbra Brands Holdings, Inc.

("**Penumbra Holdings**"). Penumbra LLC and Penumbra Holdings are collectively referred to as

(the "**Companies**").

2.      I have served as the CEO for the Companies since their formation in 2016 and I have served as the CEO for Penumbra Holdings since its formation in 2018. I have also served as the President for one of Penumbra LLC's predecessors, Invisible Gadget Guard Inc. ("**Gadget Guard**") since 2011.

3.      Based upon my positions with the Companies, I am familiar with the Companies' day-to-day operations, business, and affairs.

4.      On the date hereof (the "**Petition Date**"), the Companies filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Utah.

5.      The Companies are operating their business and managing their property as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in the Chapter 11 cases and a committee has not been appointed.

6.      In order to enable the Companies to minimize any adverse effects that filing for Chapter 11 may have on its business, the Companies have requested various types of "first day" relief, which are included in the Companies' Motion For Order Shortening Time For Notice, Objection and Hearing in Consideration of First Day Motions (the "**First Day Motion**"), described in more detail below, which this Declaration supports.

7.      The First Day Motion seeks relief intended to allow the Companies to perform and meet their obligations necessary to fulfill their duties as debtors-in-possession. I am familiar with the contents of the First Day Motion, and I believe that the relief sought by the First Day Motion: (a) is necessary to enable the Companies to operate in Chapter 11 with minimum

disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful reorganization of the business; (c) best serves the Companies estate and creditors' interest; and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.

8.      The Companies maintain books and records that reflect its assets and liabilities.

9.      I also submit this Declaration to provide an overview of the Companies, their business, and to support the Companies' Chapter 11 petitions and the First Day Motion. Except as otherwise indicated, all facts set forth in this Declaration are: (a) based upon my personal knowledge of the Companies operations and finances, (b) learned from my review of relevant documents and information supplied to me by other members of the Companies' management and employees, or (c) my opinion based on my experience, knowledge and information concerning the Companies' industry, operations and financial condition. I am authorized by the Companies' board of directors to submit this Declaration on behalf of the Companies and, if called upon to testify, I could and would testify to the facts set forth herein.

**Background**

10.     Penumbra LLC is a limited liability company formed under the laws of the state of Delaware on November 25, 2008. Penumbra LLC is a wholly-owned subsidiary of Penumbra Holdings. Penumbra Holdings is a corporation organized under the laws of the state of Delaware on July 24, 2018. The Companies' principal place of business is located at 709 North 400 West, Suite 3, North Salt Lake City, UT 84054.

11.      The Companies are managed by a board of directors. The board of directors for the Companies as of the Petition Date are Kent Forsgren, Mark Schwendiman, Jason Ellis, and me.

12.      Penumbra LLC designs, manufacturers, packages, distributes, and sells accessories for mobile devises. Those accessories include cleaning products, screen protectors, and cases. Some of the cases have antenna designs to reduce radiation exposure for the user of the phone.

13.      Penumbra LLC has 56 employees. Wages and benefits were paid current through May 8, 2020.

14.      Penumbra LLC is a wholly owned subsidiary of Penumbra Holdings. Penumbra Holdings owns no other assets other than its ownership interests in Penumbra LLC.

15.      Penumbra LLC is a result of the merger in 2016 between: (1) Gadget Guard and (2) Antenna79, Inc. ("**Antenna79**") formerly known as Pong Research Corporation ("**Pong**") and which later converted to Penumbra LLC.

16.      Gadget Guard was formed in 2007 and began by making film screen protectors for mobile devices. Subsequently, Gadget Guard expanded its business to include designing, manufacturing, packaging, distributing, and selling accessories for mobile devices (the "**Gadget Guard Products and Services**"). The Gadget Guard Products and Services include cleaning products, screen protectors, and cases. I joined Gadget Guard in 2011 as General Manager. I became President of Gadget Guard in 2014.

17.      Pong was formed in 2008 and developed mobile device antenna technology to protect users from radiation and to boost mobile device signals (the "**Antenna79 Case**

**Technology and Products**"). In 2014, L Catterton, through a wholly owned subsidiary ("**L**

**Catterton**"), an investment firm, began investing in Pong, replaced Pong's CEO, and changed

Pong's name to Antenna79, Inc.

18.     In November 2016, Gadget Guard merged into Antenna79 and the surviving

entity changed its name to Penumbra Brands, Inc. Subsequently, Penumbra Brands, Inc.

converted to Penumbra Brands LLC. As part of the merger, the shareholders of Gadget Guard

and the stockholders of Antenna79 agreed that approximately three years after the merger, they

would evaluate the gross profit generated from the Gadget Guard Products and Services and the

Antenna79 Case Technology and Products. Depending on the gross profit generated from the

products, the ownership interests in Penumbra LLC would be altered. For example, if the Gadget

Guard Products and Services were more profitable than the Antenna79 Case Technology and

Products, Gadget Guard's ownership interest in Penumbra LLC held by the previous

shareholders of Gadget Guard would increase. If the Antenna79 Case Technology and Products

were more profitable than the Gadget Guard Products and Services, the ownership of the

stockholders of Antenna79 immediately prior to the merger would increase. This arrangement

was referred to between Gadget Guard and Antenna79 as the "**Ratchet Adjustment**."

19.     Upon the merger of Gadget Guard into Penumbra LLC  (which was then known

as Antenna79), Penumbra LLC was managed by a board of directors consisting of two L

Catterton representatives, two representatives of the former shareholders of Gadget Guard, two

independent directors, and me as CEO of Penumbra LLC. As part of the merger, Penumbra LLC

assumed substantial obligations owed by Antenna79 to Hercules Technology Growth Capital

("**HTGC**") and borrowed additional funds from HTGC.

20.      In June 2018, Penumbra LLC refinanced the obligations owed to HTGC pursuant

to commercial loans funded by BBVA USA f/k/a Compass Bank, as administrative agent for

several banks and other financial institutions or entities from time to time party thereto (the

"**BBVA**"). It was at this time that Penumbra LLC, then a corporation known as Penumbra

Brands, Inc., was converted into a limited liability company, Penumbra Holdings was formed.

and the stockholders of Penumbra LLC prior to the conversion received stock in Penumbra

Holdings in exchange for their ownership interests in Penumbra LLC. The Ratchet Adjustment

was also replicated within Penumbra Holdings.

21.      The Companies entered into the following documents with BBVA:

a.      The Credit Agreement dated as of July 27, 2018 (the "**Credit

Agreement**").  A true and correct copy of the Credit Agreement is attached hereto as

**Exhibit 1**.

b.      Penumbra LLC executed in favor of BBVA the:  (i) Revolving Note dated

July 27, 2018 in the original face amount of $3,000,000 (the "**Revolving Note**") and (ii)

Term Loan Note dated July 27, 2018 in the original face amount of $22,000,000 (the

"**Term Note**").  The amounts owed pursuant to the Revolving Note and the Term Note

are collectively referred to as the "**BBVA Loans**."   True and correct copies of the

Revolving Note and the Term Note are attached hereto as **Exhibits 2 and 3**.

c.      The Companies executed the Guarantee and Collateral Agreement dated

July 27, 2018 in favor of BBVA (the "**Collateral Agreement**").  A true and correct copy

of the Collateral Agreement is attached hereto as **Exhibit 4**.

d.      Penumbra LLC and BBVA entered into the Intellectual Property Security

Agreement dated as of July 27, 2018 (the "**IP Security Agreement**"). A true and correct

copy of the IP Security Agreement is attached hereto as **Exhibit 5**.

22.      Pursuant to the Collateral Agreement, Penumbra Holdings guaranteed the

amounts owed by Penumbra LLC to BBVA.

23.      Pursuant to the Collateral Agreement and the IP Security Agreement, the Loan

Parties granted to Agents a lien on and security interest in all personal property of the

Companies, including certain intellectual property identified in the Collateral Agreement and in

the IP Security Agreement (collectively, the "**BBVA Collateral**"). BBVA perfected its security

interest in the BBVA Collateral, in part, by filing a UCC Financing Statement with the Delaware

Department of State, UCC Financing Number 2018 5132762. A true and correct copy of the

Financing Statement is attached hereto as **Exhibit 6**.

24.      In addition, Kent Forsgren, MJE Holdings, LTD, Glenn William Enterprises,

LLC, Sealion Enterprises, LLC, and Brett Bradshaw (collectively, the "**Subordinate Agents**")

and BBVA entered into the  Subordination Agreement dated July 27, 2018 (the "**Subordination**

**Agreement**"), pursuant to which the subordinated loan, as evidenced by the five (5) promissory

notes executed by Penumbra LLC in favor of each of the Subordinate Agents referenced therein

(the "**Subordinated Notes**"; together with the Subordination Agreement, the "**Subordinated**

**Loan Documents**"), were subordinated to the amounts owed to BBVA.

25.      As part of its refinance with BBVA, Penumbra also opened its primary operating

account at BBVA (the "**BBVA Operating Account**").

26.     Prior to entering into the BBVA transactions described above, Penumbra LLC maintained its primary operating account and other credit facilities at JP Morgan Chase Bank ("**Chase**"). After moving its primary operating account to BBVA, Penumbra LLC maintained the following financial accounts with Chase:

      a.      A non-primary operating account (the "**Chase Operating Account**"),

      b.      A non-primary merchant account where customers' online purchases were processed (the "**Chase Merchant Account**"),

      c.      A business credit card account (the "**Chase Credit Card**"), and

      d.      A non-primary cash reserve account or savings account and which holds the security for any outstanding balance on the Chase Credit Cards ("**Cash Reserve Account,**" together with the Chase Operating Account, Chase Merchant Account, Chase Credit Card Account, the "**Chase Accounts**").

27.     The Chase Credit Card is secured by funds held by Chase in the Cash Reserve Account. More specifically, Chase holds $100,000, the maximum Chase Credit Card balance amount, as security for any amounts owed on the Chase Credit Card. As of the petition date, $10,948.42 was owed on the Chase Credit Card. It is the Debtor's understanding that Chase does not assert a lien in any other assets of the Debtor.

28.     Pre-petition Debtor utilized the Cash Accounts in the ordinary course of its business operations. As of the petition date, Debtor had approximately $509,000 in the Chase Operating Account and approximately $4,000 in the BBVA Operating Account.

**Historical Performance**

29.     In 2015,[1] Gadget Guard generated approximately $18,000,000 in revenue and $7,000,000 in earnings before interest, taxes, depreciation, and amortization ("**EBITDA**").

30.     In 2016, Gadget Guard generated approximately $27,000,000 in revenue and $12,000,000 in EBITDA.

31.     In 2017, Penumbra LLC generated approximately $31,000,000 in revenue and $9,000,000 in EBITDA.

32.     In 2018, Penumbra LLC generated approximately $34,000,000 in revenue and $7,000,000 in EBITDA.

33.     In 2019, Penumbra LLC generated approximately $31,500,000 in revenue and $7,400,000 in EBITDA.

34.     In 2020, Penumbra LLC generated approximately $17,400,000 in revenue and $270,000 in EBITDA.

**Events Leading to Bankruptcy Filing**

35.     In the spring of 2019, Penumbra LLC lost two of its largest clients: (i) Spring Mobile, an AT&T dealer, and (ii) Sprint.

36.     Spring Mobile was sold to one of Penumbra LLC's competitors in the spring of 2019. The sale of Spring resulted in a loss of 1,400 stores that had sold Penumbra products for several years. This resulted in a loss of approximately 18% of Penumbra LLC's revenue from the prior year.

---

[1] Gadget Guard's and Penumbra LLC's fiscal year runs from April 1 of the previously calendar year through March 31 of the following year (e.g., fiscal year 2021 began on April 1, 2020).

37.     At the same time, Sprint entered into an agreement to be acquired by T-Mobile. As a result of the proposed acquisition, Sprint began to transition all of its retail company and independently owned stores over to the T-Mobile distribution network. This transition resulted in the loss of 2,000 stores that previously purchased Penumbra products and a loss of approximately 25% of the revenue Penumbra LLC generated in the prior year.

38.     In addition and in 2019, the mobile device accessory industry began to experience a softening as consumers moved away from the traditional 24-month mobile phone upgrade cycle to an average upgrade cycle of 36 months.

39.     The Companies reached out to BBVA in the summer of 2019 to let BBVA know that the Companies had suffered a substantial loss in revenue and that the Companies would likely be in covenant but not payment default under the BBVA Loan Documents come the end of 2019.

40.     In December 2019, I flew out to meet with BBVA to begin discussions towards a resolution of the anticipated payment default. BBVA requested that the Companies make a $3,000,000 principal reduction on the BBVA Loans. The Companies did not have the ability to make the requested principal reduction.

41.     On January 14, 2020, with no prior notice, the board of directors conveyed to me their decision to hire a new CEO and that they had commenced a search for a replacement. The board also conveyed that certain directors would take over the role of communication with BBVA from me. The board asked me to continue in an interim role until a replacement was hired, and I agreed. While this sub-optimal arrangement created uncertainty within the ranks of

the senior leadership of the Company, it was deemed less disruptive than my outright termination prior to identifying a replacement.

42.     At the end of January 2020, representatives, including certain directors, from the Companies, but not myself, again flew out to meet with representatives of BBVA to discuss potential resolutions of the covenant defaults. BBVA requested an equity guarantee that would require the infusion of equity if certain performances levels were not achieved. The Companies were not able to provide the requested guarantee.

43.     On or about February 14, 2020, BBVA sent the Companies a notice of default letter (the "**Notice of Default**"). A true and correct copy of the Notice of Default is attached hereto as **Exhibit 7.** The Notice of Default articulated BBVA's position that the Companies were in default for violating certain financial covenants and reporting requirements and for failing to make an excess cash flow principal payment in July 2019. At this time, Penumbra LLC had not defaulted on a single regularly scheduled interest or principal payment with BBVA.

44.     At this same time, the economy began to catastrophically change as the Covid-19 pandemic hit the United States. States across the country began implementing stay at home orders and directives that required retail businesses across the country to temporarily close operations. Approximately 90% of Penumbra LLC's revenues are generated from in person retail sales. As retail stores across the country began to close, Penumbra LLC quickly experienced a drastic reduction in its sales revenues.

45.     In March 2020 and pursuant to the terms of the original merger of Gadget Guard and Antenna79, Penumbra Holdings began the Ratchet Adjustment. After evaluating the gross profit generated from the sale of the Gadget Guard Product and Services and the Antenna79

Technology and Product, the prior shareholders of Gadget Guard were entitled to additional shares of stock in Penumbra Holdings. On or about April 13, 2020, Penumbra Holdings issued 235,715,617 shares of its Class D Common Stock to the original owners of Gadget Guard. This stock issuance resulted in a change of control over the Companies. L Catterton began taking a lesser role in managing the Companies, and prior Gadget Guard shareholders and board members began taking a more active role.

46.     In light of the unsuccessful meetings with BBVA in December 2019 and January 2020, following receipt of the Notice of Default Letter from BBVA, and grave cash flow concerns resulting from the unforeseeable but increasingly dire impact of Covid-19, the board of directors became concerned that BBVA would offset the amounts owed to BBVA against the cash Penumbra LLC held on deposit with BBVA. If BBVA took those steps, Penumbra LLC would have had no choice, but to immediately close its business operations and terminate its 56 employees.

47.     As a precaution, and at the direction of the board of directors, Penumbra LLC began transferring its operating funds from BBVA to Chase. More specifically, through a series of transfers between March 20 and 31, 2020, Penumbra LLC transferred $2,090,000 (the "**BBVA Funds**") to Chase. At the time of the transfer of the BBVA Funds, Penumbra LLC had $385,952.09 on deposit with Chase (the "**Chase Funds**").

48.     At the end of March 2020, Congress passed, and the President signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "**CARES Act**"). Pursuant to the Paycheck Protection Program under the CARES Act, Penumbra LLC applied for and obtained a paycheck protection program loan (the "**PPP Loan**") from Chase guaranteed by the U.S. Small

Business Administration ("**SBA**"). A true and correct copy of the Promissory Note evidencing the PPP Loan is attached hereto as **Exhibit 8**. The PPP Loan is unsecured. See Ex. 8 ¶ 12.C.

49.     Collectively, the "PPP Funds," "BBVA Funds," "Chase Funds," any cash on deposit with Chase, and any cash generated post-petition from the sale of pre-petition inventory are referred to as the "**Cash Collateral**."

50.     On April 1, 2020, following an unproductive search for a replacement, the Board notified me that they were abandoning their search for a new CEO and asked me to resume my duties as CEO. Given the state of Penumbra LLC and the economy in general as the Covid-19 pandemic intensified, I agreed.

51.     Prior to applying for the PPP Loan with Chase, Penumbra LLC inquired with BBVA as to whether it would be willing or interested in processing Penumbra LLC's PPP Loan request. BBVA was not interested in processing the PPP Loan application and encouraged Penumbra LLC to apply for the PPP Loan through Chase.

52.     On or about April 15, 2020, Penumbra LLC obtained PPP Loan funds from Chase in the amount of $620,883 (the "**PPP Funds**"). The PPP Funds were deposited into the Chase Operating Account (the same account where the Chase Funds and the BBVA Funds were deposited).

53.     Pre-petition Penumbra LLC has utilized the Funds to operate its business.

54.     During March and April 2020, BBVA and Penumbra LLC attempted to negotiate a forbearance agreement.

55.     On April 16, 2020, at the height of the Covid-19 pandemic, BBVA issued a

Notice of Default and Acceleration Letter to the Companies ("**Acceleration Letter**"). A true and

correct copy of the Acceleration Letter is attached hereto as **Exhibit 9**.

56.     As an act of good faith during forbearance negotiations and on April 29, 2020,

Penumbra LLC deposited $185,000 in its BBVA Operating Account, an amount sufficient to pay

the March and April 2020 interest payments. On April 30, 2020 BBVA swept the funds.

57.     Two business days later on Monday, May 4, 2020, BBVA filed a Complaint

against the Companies in the Second Judicial District Court in Davis County, Utah (Case

Number 200700396) and an Emergency Motion for the Appointment Receiver over the

Collateral ("**Motion to Appoint**"). BBVA provided the Companies' counsel with a copy of the

filings by email in the late afternoon of Tuesday, May 5, 2020. The Companies were served with

the Complaint and Motion to Appoint on May 6, 2020. A hearing on the Motion to Appoint is

scheduled for Monday, May 11, 2020 at 1:30 p.m.

58.     If a Receiver is appointed over the BBVA Collateral, Penumbra LLC will be

required to immediately cease operations, terminate its 56 employees, and there will be no

opportunity for the Companies to reorganize and repay their creditors.

59.     In order to address its creditors and obligations and to allow the Companies time

to reorganize its business operations, the Companies seek relief under Chapter 11 of the United

States Bankruptcy Code.

**Ability to Reorganize**

60.     With temporary relief from paying pre-petition creditors, I am confident that the

Companies have the ability to reorganize and pay creditors.

61.    The Companies have taken several steps to return to profitability:

a.    In February 2019, Penumbra LLC hired a Vice President of Marketing ("**VPM**"). The VPM has an MBA form a prestigious university and extensive experience in the mobile device industry. She has created a marketing group and has led the development of Penumbra LLC's e-commerce business. Prior to her hiring, Penumbra LLC's website was primarily used for warranty claim fulfillment, but not e-commerce. She has developed and implemented a plan to remove unauthorized vendors of Penumbra LLC's products on Amazon and has created and developed Penumbra's e-commerce program to sell its products directly to consumers. As a result of her efforts, online product sales are up 220% year over year. In April 2020 alone, Penumbra generated $350,000 in revenue from online sales. Beginning February 2020, the VPM undertook a strategic marketing campaign with updated messaging and imagery for the entire company.

b.    Penumbra LLC has developed new profitable business relationships. In November 2019, Penumbra LLC partnered with a successful case company to develop a new product that protects consumers from radiation emitted from mobile devices and which is also compostable. This new relationship has resulted in the sale of 20,000 products in just a few months.

c.    In 2019, Penumbra LLC restructured its product development process and put its Chief Technology Officer in charge of all product development (the "**CTO**"). The CTO has a PhD in physics and extensive experience in both antenna design and the mobile device industry. The CTO has developed an improved and comprehensive line of

mobile device radiation reduction technology. The new product line has a much broader

total addressable market, has been very successful, and continues to grow.

      d.     Penumbra LLC appointment an e-commerce specialist whose primary job

responsibility is expanding Penumbra LLC's sales through various large e-commerce

networks. Penumbra LLC's e-commerce revenue from third parties (e.g., Amazon)

continues to grow.

      e.     On January 1, 2020, Penumbra LLC hired a Chief Growth Officer (the

"**CGO**"). The CGO has extensive experience and significant contacts in the mobile

device industry. His role is to develop revenue generated from strategic partnerships.

Through these efforts and in just a few short months which have included the Covid-19

pandemic (for which the CGO tested positive), the CGO has made inroads which have

helped and will continue to help Penumbra LLC grow its strategic partnership revenue

significantly.

      f.     In 2019 and 2020, Penumbra LLC developed two new product features

that allow its products to be more easily installed directly by consumers. Previously,

consumers relied heavily on mobile device retail store sales associates for the installation

of Penumbra LLC's products. These new products allow customers to install the

products independently, allowing Penumbra LLC to capture a greater share of the direct-

to-consumer market.

**A.     Cash Collateral Motion**[2]

62.     As of the petition date, Penumbra LLC maintained the following accounts and balances:

> a.      BBVA Operating Account $3,909.82.
>
> b.      BBVA Merchant Account $2,163.27.
>
> c.      Chase Operating Account $509,514.31.
>
> d.      Chase Cash Reserve Account $1,861,311.07.
>
> e.      Chase Merchant Account $55,022.48.

63.     According to BBVA, BBVA is owed the principal amount of $20,350,000 on the BBVA Loans.

64.     It is Penumbra LLC's understanding that, other than the Credit Reserve Account held by Chase, BBVA is the only creditor that asserts a security interest in the BBVA Collateral.

65.     As of the petition date, Penumbra LLC believes its assets are worth less than the amounts owed to BBVA.

66.     Penumbra LLC believes BBVA holds a security interest in Penumbra LLC's personal property including inventory, accounts receivable, and proceeds derived from them. It is unclear, however, whether BBVA maintains a properly perfected security interest in the funds on deposit at Chase where the BBVA Funds have been comingled with the Chase Funds and the

---

[2] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in Debtor's Motion for Interim and Final Orders Pursuant to Sections 105(a), 361, 362, 363, 506, 507, and 552 of the Bankruptcy Code: (I) Authorizing the Use of Collateral and Cash Collateral; (II) Granting Adequate Protection and a Lien; (III) Authorizing the Use of Certain Prepetition Accounts, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "**Cash Collateral Motion**"), filed contemporaneously herewith.

PPP Funds. Penumbra LLC does not believe that this issue needs to be resolved at this time because BBVA is adequately protected given that Penumbra LLC proposes to provide BBVA with a replacement lien in post-petition assets to the same extent and priority as existed prepetition, for all Cash Collateral actually expended during the Interim Period (as subsequently defined herein) in which BBVA held a properly perfected secured interest. This will allow the Court to resolve later whether BBVA holds a security interest in the Cash Collateral.

67.     Due to the emergency nature of this filing, the undersigned has not yet had a full opportunity to review all loan agreements or related documents associated with the BBV Loans and/or funds held at BBVA. At this point, Penumbra LLC relies upon its understanding that the underlying loan documents, if any, are secured by the purported perfected liens on Penumbra LLC's personal property and intellectual property, pursuant to the Collateral Agreement and IP Security Agreement and corresponding UCC Financing Statement. The Debtor reserves the right to challenge the extent and perfection of any liens at a later date. Moreover, the Debtor reserves the right to challenge the value of the purported collateral secured by any liens.

68.     Through the Cash Collateral Motion, Penumbra LLC seeks authority to use Cash Collateral.

69.     Absent authority to use Cash Collateral, Penumbra LLC will not be able to successfully transition into Chapter 11 and otherwise preserve and maximize the value of its assets for the benefit of its creditors and the estate.

70.     A true and correct copy of the anticipated revenue and expenses needed from the Petition Date through June 13, 2020 (the "**Interim Period**") is attached as **Exhibit A** to the Cash Collateral Motion.

71.     During the Interim Period, the Cash Collateral will be used to pay (i) amounts authorized for payment pursuant to other first day motions filed concurrently herewith, (ii) operating costs and expenses, and (iii) other administrative and bankruptcy related expenses projected to be incurred during the Interim Period, as set forth in the Budget.

72.     Penumbra LLC's primary source of cash and ability to maximize value in this case is dependent upon collecting future revenue from the sale of inventory and the purchase of new inventory. Thus, the use of Cash Collateral is essential to Penumbra LLC's ability to efficiently preserve and maximize the value of its assets as it transitions into Chapter 11.

73.     During the Budget Period, with the benefit of the automatic stay and access to the Cash Collateral, Penumbra intends to focus on increasing its revenues from the continued acquisition and sale of inventory. Without access to the Cash Collateral at this critical point in the case, however, Penumbra LCC will be unable to reorganize its business and maximize value for the benefit of its creditors and the estate.

74.     Prior to the Petition Date, Penumbra LLC reviewed its cash flow projections in detail. It became imperative that Penumbra LLC commence this case as soon as possible in order to preserve value.

75.     Penumbra LLC respectfully requests that the Court enter the Interim Order, substantially in the form attached as **Exhibit B** to the Cash Collateral Motion, granting the following relief, among other relief, on an interim basis:

     a.     Authorizing use of the Cash Collateral during the Interim Period in the amounts set forth in the proposed Budget and in accordance with terms set forth in the Interim Order;

      b.      Authorizing Penumbra LLC to make the payments contemplated by the proposed Budget during the Interim Period;

      c.      Granting BBVA the adequate protection proposed in the Interim Order for Penumbra LLC's use of the Cash Collateral, including, without limitation, for any diminution in value resulting from the payment of expenses provided for in the Budget and Interim Order; and

      d.      Granting the related relief as set forth in the proposed Interim Order.

76.      Without the ability to use Cash Collateral, there will be no possibility for Penumbra LLC to reorganize and maximize the value for creditors. Penumbra submits that whatever interests BBVA may have in the Cash Collateral are protected by virtue of the adequate protection provided for in the proposed Interim Order and Final Order. More particularly, BBVA will receive a lien in post-petition assets to the same extent and priority as existed prepetition, for all Cash Collateral actually expended during the Interim Period (as subsequently defined herein) in which BBVA held a properly perfected secured interest.

77.      Immediate relief in the form of the proposed Interim Order is necessary to avoid irreparable harm during the Interim Period. Absent approval, Penumbra LLC will not be able to maximize the value of the estate or reorganize.

78.      Based upon the foregoing, using Cash Collateral is necessary and appropriate, is in the best interests of Penumbra LLC and the estate, and should be authorized.

79.      The use of Cash Collateral represents the only viable way to orderly reorganize and repay creditors and Penumbra LLC believes in its business judgment that these provisions are necessary and justified under the circumstances.

80.     Further, Penumbra, LLC seeks the authority to continue the use of its prepetition bank accounts including the BBVA Accounts and the Chase Accounts, cash management systems, treasury management systems, or business forms (collectively, the "**Existing Accounts**"). Allowing Penumbra LLC to continue to utilize the Existing Accounts post-petition will allow Penumbra to continue to receive payments on existing and new orders without interruption or delay.

81.     In addition, Penumbra LLC submits that the ability to continue the use of its Existing Accounts is necessary and appropriate to enable Penumbra LLC to continue operating, maximize the value of its assets, and contribute toward a successful reorganization.

**B.     Motion for Joint Administration[3]**

82.     The Debtors anticipate that numerous notices, applications, motions, pleadings, hearings, and orders in these Chapter 11 Cases will effect both Debtors.

83.     Joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for the Debtors and for the parties in interest to (i) use a single caption on the numerous documents that will be served and filed herein and (ii) file the papers in one case rather than two cases.

84.     Joint administration will protect parties in interests by ensuring that parties in both of the Debtor's respective Chapter 11cases will be apprised of the various matters before the Court in these Chapter 11 Cases.

---

[3] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in the Companies' joint Motion for Entry of Order Under Fed. R. Bank. P. 1015(B) Directing the Joint Administration of Chapter 11 Cases ("**Motion for Joint Administration**"), filed contemporaneously herewith.

85.     The rights of the respective creditors of each of the Debtors will not be adversely affected by the joint administration of these Chapter 11 Cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights. Each creditor and other party in interest will maintain whatever rights it has against the particular estate against which it allegedly holds a claim or right.

86.     In furtherance of the foregoing, the Debtors reqquested that the official caption of the Chapter 11 Cases to be used by all parties in all pleadings in the jointly administered cases be as follows:

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re:<br><br>PENUMBRA BRANDS, LLC, *et al.*,[fn]<br><br>Debtors, | Bankruptcy No. 20-22804<br><br>Chapter 11<br>(Jointly Administered)<br><br>Honorable Joel T. Marker |

87.     The Companies believe that the use of this caption will ensure a uniformity of pleading identification.

88.     In addition, the Companies request that the Court make a docket entry on the docket sheet of Penumbra Holdings, substantially similar to the following:

> 1.     An order has been entered in this case consolidating this case with the case of Penumbra Brands, LLC (20-22804) for procedural purposes only and providing for its joint administration in accordance with the terms thereof.  The docket in Case No. 20-22804 should be consulted for all matters affecting the above listed case.

### C.    Critical Vendor Motion[4]

89.    As part of the First Day Motions, Penumbra LLC seeks Court authority to pay four pre-petition creditors.

90.    More specifically, Penumbra LLC seeks Court authority to pay pre-petition amounts owed to: (i) SSM Distributing ("**SSM**"), (ii) Lab-Clean, Inc. ("**Lab-Clean**"), (iii) Shenzhen Gobelike Technology ("**Gobelike**"), and (iii) Sonnenschein Ind. Col, Ltd. ("**Sondata**") (collectively, the "**Critical Vendors**").

91.    SSM provides Gadget Guard labeled packaging (the "**Packaging**") for Penumbra LLC. Pre-petition, Penumbra LLC purchased 450,000 Packaging units that are presently sitting in SSM's warehouse. Penumbra LLC cannot convert its inventory into revenue without the Packaging. SSM is a local company with the unique ability to quickly deliver high volume packaging, store it, deliver the product to Penumbra LLC, and does not charge Penumbra for the packaging until it is delivered. The Packaging and a continued relationship with SSM are critical to Penumbra LLC's reorganization efforts. SSM is owed approximately $139,845 pre-petition. SSM has agreed to accept payment of $120,000 from Penumbra LLC in exchange for a partial satisfaction of its pre-petition claim. SSM will deliver the Packaging to Penumbra LLC as it is needed and will continue to provide Penumbra with branded packaging post-petition. SSM will maintain a pre-petition unsecured claim against the estate for any pre-petition amounts owed in

---

[4] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in Penumbra LLC's Motion for Order Pursuant to 11 U.S.C §§ 105(a), 363(b), and 503(b) Authorizing the Debtor to Pay Prepetition Claims of Critical Vendors (the "**Critical Vendor Motion**"), filed contemporaneously herewith.

excess of $120,000. Penumbra LLC believes the Packaging has the ability to allow Penumbra LLC to generate post-petition revenue of approximately $1,350,000.

92.     Lab-Clean manufactures the liquid screen protector product ("**Liquid Protector**") that Penumbra LLC sells in its Packaging. Penumbra LLC needs the Liquid Protector in order to generate a portion of the $1,350,000 in revenue discussed above. Lab-Clean is owed approximately $53,000 pre-petition. Lab-Clean has agreed to accept $43,000 for the product necessary to fulfill approximately 100,000 of the 450,000 Packaging units described above. Lab-Clean has agreed to accept payment of $43,000 from Penumbra LLC in exchange for a partial satisfaction of its pre-petition claim. Lab-Clean will maintain its pre-petition unsecured claim against the estate for any amounts owed in excess of $43,000. Lab-Clean will continue to provide post-petition product to Penumbra LLC that will allow Penumbra LLC the ability to continue to generate post-petition revenue.

93.     Gobelike and Sondata are critical vendor providers that are located in Asia.

94.     Gobelike manufactures tempered glass screen protectors for mobile devices to Penumbra LLC's specifications. Penumbra LLC has a long-standing relationship with Gobelike. Gobelike is owed approximately $112,000 pre-petition. Gobelike has substantial units ready to ship to Penumbra LLC and substantial units in progress. The completed and work in progress units are collectively referred to as the "**Gobelike Units**."  Penumbra LLC believes that if it is allowed to pay up to $75,000 to Gobelike, then Gobelike will deliver the Gobelike Units and Gobelike will continue to provide Penumbra LLC with product post-petition. Gobelike will maintain a general unsecured claim against the estate for any amounts owed less the pre-petition payment made by Penumbra LLC.

95.     Sondata provides composite guards for mobile devices, manufactured to
Penumbra LLC's specifications. They are owed approximately $41,000 pre-petition. Sondata is a
relatively new vendor for Penumbra LLC. Penumbra LLC believes that if it is allowed to pay up
to $40,000 to Sondata, then Sondata will deliver existing product that is ready to be shipped to
Penumbra LLC and will continue to provide Penumbra LLC with product post-petition. Sondata
will maintain a general unsecured claim against the estate for any amounts owed less the pre-
petition payment made by Penumbra LLC.

96.     In order to replace Gobelike and Sondata as vendors, Penumbra LLC would need
to identify new vendors, compare pricing, and evaluate the new vendors' ability to timely
produce and provide quality products to Penumbra LLC's specifications. This process cannot be
done virtually and must be done in- person. Due to the global pandemic, this in-person process
cannot be done. The next available opportunity to evaluate potential replacement vendors cannot
take place until the next scheduled vendor tradeshow in Asia. The next tradeshow is currently
scheduled for October 2020, but, like the tradeshow that was scheduled for April 2020, may be
cancelled due to the pandemic.

97.     Penumbra LLC believes it is in the best interests of its estate and all of its
creditors to obtain authority to pay the amounts requested to be paid to the Critical Vendors in
the ordinary course of business. Payment of such vendors will allow Penumbra LLC to preserve
the value of its assets and continue to operate its business with minimal disruption, allowing
Penumbra LLC to generate the necessary revenue to facilitate a successful reorganization.

98.     Penumbra LLC considers the Critical Vendors to be critical and vital to its
operations because: (a) those parties provides Penumbra LLC with goods and services that are

essential to Penumbra LLC's business; (b) replacing the products cannot be done without disrupting or otherwise harming the Debtor's business (at least in the near term); (c) the Critical Vendors have indicated to Penumbra LLC, and/or there is a substantial risk, that they will not supply Penumbra LLC with post-petition goods and services without payment of at least a portion of their prepetition claims, or will only deal with Penumbra LLC on COD terms; and (d) not one of the vendors is not obligated by contract, or otherwise, to supply Penumbra LLC post-petition.

99.     Here, if Penumbra LLC was required to replace its vendors, such an effort would consume a significant amount of management's time, distract management from focusing on proposing and developing a plan of reorganization, and cost the estate substantially more than simply paying critical vendors to ensure that Penumbra LLC's business functions during the Chapter 11 Case with few distractions and disruptions. Second, if Penumbra LLC sought alternative suppliers, the process would be severely disruptive to the business operations. Third, if Penumbra LLC were to cease business operations, even for a short time due to the lack of product to sell, Penumbra LLC would be irreparably harmed. Therefore, it is essential that Penumbra LLC be authorized to pay the Critical Vendors in order to preserve the value of Penumbra LLC's assets and continue to operate its business with minimal disruption and avoid substantial and irreparable harm, and there is no real alternative other than payment of the Critical Vendors.

D.    **Utility Motion**[5]

100.    In connection with the operation of its business and management of its estate,

Penumbra LLC obtains electricity, gas, and other similar services (collectively, the "**Utility**

**Services**") from a number of utility companies (collectively the "**Utility Providers**"), including

those listed on **Exhibit A** to the Utility Motion (the "**Utility Provider List**").[6]

101.    Penumbra LLC intends to pay all post-petition obligations and expects that

revenues generated from its business operations consistent with the terms of the Cash Collateral

orders will be sufficient to pay all undisputed post-petition obligations owed to the Utility

Providers in a timely manner. However, to provide adequate assurance of payment for future

services to the Utility Providers, Penumbra LLC proposes to deposit an initial sum equal to

Penumbra LLC's estimated average cost for two (2) weeks of Utility Services (the "**Adequate**

**Assurance Deposit**"), into a segregated account (the "**Adequate Assurance Account**") within

fourteen (14) days of the Petition Date, subject to interim approval of Penumbra LLC's post-

petition use of Cash Collateral.

102.    In the ordinary course of business, Penumbra LLC regularly incurs utility

expenses for Utility Services provided by various Utility Providers. Penumbra LLC has a long

and established payment history with most or all of the Utility Providers. Penumbra LLC's

---

[5] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth in the Debtor's Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "**Utility Motion**"), filed contemporaneously herewith.

[6] The inclusion of any entity on, as well as any omission of any entity from, **Exhibit A** is not an admission by the Debtor that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtor reserves all rights with respect thereto.

aggregate average monthly cost for utility services is approximately $4,275.71. Penumbra LLC proposes that the Adequate Assurance Deposit should be approximately $2,100.

103.    Penumbra LLC further proposes to maintain the Adequate Assurance Account with a minimum balance equal to Penumbra LLC 's estimated average two-week cost of Utility Services through the Final Hearing on the Utility Motion. Thereafter, Penumbra LLC proposes to adjust the amount in the Adequate Assurance Account to reflect the following factors: (i) the termination of Utility Services by Penumbra LLC regardless of any Additional Assurance Requests and (ii) agreements with the Utility Providers. These adjustments will permit Penumbra LLC to maintain the Adequate Assurance Account with an amount that consistently provides the Utility Providers that do not otherwise hold deposits or security for their Utility Services with a two-week deposit on account of such services.

104.    Penumbra LLC submits that the Adequate Assurance Deposit, taken together with the facts and circumstances of this Chapter 11 case (together, the "**Proposed Adequate Assurance**"), constitute sufficient adequate assurance to the Utility Providers. Moreover, Penumbra LLC is seeking approval of use of Cash Collateral that Penumbra believes will provide adequate liquidity to meet their cash needs during this Chapter 11 case.

105.    As a result, Penumbra LLC is likely to continue paying, and be able to continue paying, their obligations to the Utility Providers post-petition.

106.    Although Penumbra LLC has made an extensive and good-faith effort to identify all the Utility Providers, certain Utility Providers that currently provide Utility Services to Penumbra may not be listed on the Utility Provider List. To the extent that Penumbra subsequently identifies additional Utility Providers, or determines that an entity was improperly

included as a Utility Provider, Penumbra LLC requests the authority, in its sole discretion and

without further order of this Court, to amend the Utility Provider List to add or delete any Utility

Provider. If Penumbra LLC adds any Utility Providers to the Utility Provider List, Penumbra

LLC will serve a copy of the Utility Motion, along with the applicable portion of the amended

Utility Provider List and the interim order or final order (as applicable), on such Utility Provider

within five (5) business days after Penumbra LLC files the amended Utility Provider List. Such

subsequently added Utility Provider will be subject to the Adequate Assurance Procedures set

forth herein. For any entity that is removed from the Utility Provider List, Penumbra LLC shall

serve that entity with notice of removal and such entity shall have five (5) days from the date of

service of such notice to object to that removal.

107.    The Utility Services are essential to the preservation of Penumbra LLC's estate

and assets, and therefore, to the success of its Chapter 11 Case. Should any Utility Provider

refuse or discontinue service, even for a brief period, Penumbra LLC's ability to preserve and

maximize the value of its estates could be severely and irreparably harmed. Indeed, any

interruption of the Utility Services would disrupt Penumbra LLC's ability to operate and

maintain its business and would thereby negatively affect Penumbra LLC's customer

relationships and revenues. Such a result could seriously jeopardize Penumbra LLC's

reorganization and/or liquidation efforts and, ultimately, its value and constituent recoveries. It is

therefore critical that the Utility Services continue uninterrupted.

108.    Penumbra LLC seeks the relief requested in the Utility Motion with respect to all

the Utility Providers providing Utility Services to Penumbra LLC, including, but not limited to,

those listed on the Utility Provider List. Penumbra reserves the right to supplement the Utility

Provider List by filing a notice or notices with this Court.

**E.      Application To Employ H&H[7]**

109.    Penumbra LLC requests the entry of an order to employ H&H as its counsel to

perform the legal services that will be necessary in this Chapter 11 case.

110.    Penumbra LLC has chosen H&H because certain of its attorneys have extensive

experience and knowledge of bankruptcy, business reorganization, and Penumbra/creditor

matters, and it has a long-standing client relationship with H&H. The attorneys who will be

primarily engaged on this matter are set forth in the Olsen Declaration.

111.    In addition, certain attorneys at H&H have extensive experience and knowledge

in other areas of law which are likely to be involved in this case and their services will also be

utilized as necessary. Penumbra LLC believes that H&H is both well qualified and able to

represent it in this Chapter 11 case.

112.    H&H has indicated its willingness to represent Penumbra LLC in this case, to

render the services and to be compensated as set forth below.

113.    Penumbra LLC contemplates that H&H may provide the full range of legal

services required to represent Penumbra LLC in the course of this case, including:

a.      To prepare on behalf of Penumbra LLC any necessary motions,

applications, answers orders, reports and papers as required by applicable bankruptcy or

---

[7] Unless otherwise defined herein, defined terms in this section shall have the meanings set forth
in the Debtor's Application of the Debtor for Entry of an Order Authorizing the Retention and
Employment of Holland & Hart LLP as Counsel for the Debtor (the "**Application to Employ
H&H**"), filed contemporaneously herewith.

nonbankruptcy law, dictated by the demands of the case, or required by the Court, and to represent Penumbra LLC in proceedings or hearings related thereto;

      b.      Provide advice to Penumbra LLC with respect to its powers and duties as a debtor in possession in the continued conduct of its business;

      c.      Negotiate with creditors of Penumbra LLC and other parties in interest in developing a plan of reorganization, and taking any necessary steps to obtain confirmation of, and to implement such plan;

      d.      Review, **analyze** and advise Penumbra LLC regarding claims or causes of action to be pursued on behalf of the estate;

      e.      Assist Penumbra LLC in negotiations with various creditor constituencies regarding an exit, resolution and payment of the creditors' claims herein;

      f.      Review and **analyze** the validity of the claims filed herein and advise Penumbra LLC as to the filing of objections to claims, if necessary;

      g.      To provide **continuing** legal advice with respect to the bankruptcy, estate, litigation, avoidance actions and miscellaneous other legal matters; and

      h.      To perform all other necessary legal services as may be prompted by the needs of Penumbra LLC in this case.

114.    To the best of Penumbra LLC's knowledge, H&H does not have any connection with Penumbra LLC, its creditors or other parties in interest or their respective attorneys, except as set forth in the Olsen Declaration, filed contemporaneously herewith, and is a disinterested person as that term is used in section 101(14) of the Bankruptcy Code.

115.    Penumbra LLC believes it is in its best interest and that of the bankruptcy estate that H&H be retained as its counsel. Penumbra LLC is satisfied from the Olsen Declaration, filed contemporaneously herewith, that H&H does not represent any other entity having an adverse interest to Penumbra LLC, the bankruptcy estate, or unsecured creditors in this case and is otherwise disinterested, except to the extent set forth in the Olsen Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Gentry W. Jensen
Gentry W. Jensen

14610380_6